Charles W. RANDOLPH, II

v.

EASTMAN CHEMICAL COMPANY.

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Feb. 18, 2005 Session.

May 9, 2005.

Permission to Appeal Denied by
Supreme Court Oct. 31, 2005.

Timothy A. Housholder, Knoxville, Tennessee, for the Appellant Charles W. Randolph, II.

Richard M. Currie, Jr., Kingsport, Tennessee, for the Appellee Eastman Chemical Company.

**OPINION**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and PATRICIA J. COTTRELL, JJ., joined.

Charles W. Randolph, II, ("Plaintiff") is an engineer employed by TesTex, Inc. ("TesTex"). Eastman Chemical Company ("Eastman" or "Defendant") entered into a contract with TesTex for TesTex to conduct non-destructive electromagnetic test-

ing on heat exchangers located at Eastman's Kingsport facility. The testing was to occur during a plant shutdown which lasts for twenty days and which occurs every two years. Plaintiff was on Eastman's premises to conduct the electromagnetic testing when he was injured while boarding an elevator. Plaintiff filed a negligence lawsuit against Eastman. Eastman asserted that it was Plaintiff's statutory employer pursuant to Tenn.Code Ann. § 50–6–113 and, therefore, Plaintiff was prohibited from filing a negligence claim because of the exclusive remedy rule contained in the workers' compensation law. After a trial, the Trial Court agreed with Eastman and held that Plaintiff's negligence claim was barred. We affirm.

### *Background*

On May 14, 2001, Plaintiff was on Eastman's premises to begin conducting the non-destructive electromagnetic testing. Plaintiff and other TesTex employees were directed to board a particular elevator which, according to Plaintiff, had two horizontally opposed doors, "one top and one bottom, that meet in the middle." Plaintiff claims that as he was entering the elevator, the top door on the elevator suddenly and without warning forcefully dropped down striking him on the head and knocking him to the ground. Plaintiff claims he suffered serious and permanent injuries as a result of the accident.

In May of 2002, Plaintiff filed a tort action against Eastman alleging negligence

by Eastman and/or its employees.[1] Eastman answered the complaint and denied that it or any of its employees engaged in any negligent conduct or that it otherwise had any tort liability to Plaintiff. Eastman also claimed that it was Plaintiff's "statutory employer" pursuant to Tenn.Code Ann. § 50–6–113 and, therefore, Plaintiff's negligence claim was barred by the exclusive remedy rule contained in the workers' compensation law, Tenn.Code Ann. § 50–6–108. In light of Eastman's answer, Plaintiff amended his complaint to add, alternatively, that he was entitled to workers' compensation benefits if Eastman was Plaintiff's statutory employer.

Eastman filed a motion for summary judgment claiming the undisputed material facts demonstrated that it was Plaintiff's statutory employer and, therefore, Plaintiff's negligence claim was barred by the exclusive remedy rule.[2] After Plaintiff responded to Eastman's motion, the Trial Court denied the motion after concluding there were genuine issues of material fact.

Even though Defendant's motion for summary judgment was denied, the issue of whether Eastman was Plaintiff's statutory employer thus barring a negligence claim remained a critical issue which impacted the remaining course of the proceedings. For example, Plaintiff had requested a trial by jury on his tort claim, but a jury trial is not available in a workers' compensation claim. Other practical distinctions between tort claims and workers' compensation claims were recently

1. Plaintiff also sued the manufacturer of the elevator but that claim was dismissed with the entry of an agreed order granting the manufacturer's motion for summary judgment. The dismissal of that claim is not at issue on appeal.

2. In relevant part, the exclusive remedy rule codified at Tenn.Code Ann. § 50–6–108 provides: "The rights and remedies herein granted to an employee subject to the Workers' Compensation Law on account of personal injury or death by accident, including a minor whether lawfully or unlawfully employed, shall exclude all other rights and remedies of such employee, such employee's personal representative, dependents or next of kin, at common law or otherwise, on account of such injury or death."

discussed by our Supreme Court as follows:

> [Although] workers' compensation claims and tort claims may arise from one injury, involve the same plaintiff and proceed simultaneously, they may not be combined into one lawsuit. To do so would confuse the fault-based liability of tort with the statutorily imposed "no fault" liability of workers' compensation. The justifications for imposing liability upon an employer are entirely separate and distinct from those supporting imposition of liability upon a third party tortfeasor. Accordingly, an employer cannot allocate fault to a third party and neither may an employee combine workers' compensation and tort claims in one action. In these instances, fault may not be compared and apportioned between the employer and tortfeasor, and any such claims must be brought in two separate actions....

*Curtis v. G.E. Capital Modular Space*, 155 S.W.3d 877, 883–84 (Tenn.2005).

In an attempt to prevent potentially unnecessary litigation costs, attorney fees, etc., the parties and the Trial Court wisely agreed to conduct a mini-trial on the sole issue of whether Eastman was Plaintiff's statutory employer. After this mini-trial was completed, the Trial Court concluded Eastman was Plaintiff's statutory employer and, therefore, Plaintiff's negligence claim was barred by the exclusive remedy rule. The Trial Court then transferred Plaintiff's surviving workers' compensation claim to its non-jury docket. Pursuant to Tenn. R. Civ. P. 54.02, the Trial Court stated that there was no just reason for

delay and designated its judgment on the statutory employer issue as final.[3]

Plaintiff appeals claiming the Trial Court erred when it concluded that Eastman was his statutory employer and, as a result of this ruling, then dismissed Plaintiff's negligence claim because it was barred by the exclusive remedy rule.

### *Discussion*

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R.App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn.2001). *Cf.* Tenn. Code Ann. § 50–6–225(e)(2). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Most of the underlying facts in this case are undisputed or uncontested. The first of only two witnesses called at trial was Eric M. Kniedler ("Kniedler"), a chemical engineer employed by Eastman for twenty-three years. Kniedler testified that Eastman manufactures a multitude of different chemicals, plastics and fibers. Eastman has a coal gasification facility which is comprised of two departments, a gasification department and an acetic anhydride department. Kniedler is the superintendent for the acetic anhydride department and manages its day-to-day operations and the roughly 100 employees who work in

---

**3.** As relevant, Tenn. R. Civ. P. 54.02 provides: "When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

that department. The gasification department makes carbon monoxide and a synthetic gas called Syngas out of the coal. Kniedler's department then uses these two gases to make acetic anhydride and acetic acid which are used by Eastman internally to make many other products. Kniedler described the acetic anhydride and acetic acid as "feed stock for a multitude of different chemicals within our particular division and within other divisions."

Kniedler testified that the coal gasification facility operates continuously except when it is routinely shutdown once every two years for cleaning and inspections. Capital improvements and any needed repairs also are accomplished during this shutdown. Kniedler stated that the shutdown occurs every two years and has been taking place since the facility's inception in 1980 or 1981. A shutdown usually lasts for twenty days and, according to Kniedler:

> We call it the complex shutdown because it takes ... the whole complex down.... A lot of times the planning for the next shutdown starts immediately on completion of the shutdown that took place. We do a lot of inspections, and there's some long-term delivery items that need to be gotten, such as if we find that a particular reactor or heat exchanger or distillation column needs some work, there's long-term delivery for this material. So we will initiate the paperwork to get the capital project approved and start that work right away. About six months in advance [of the shutdown], we will assign an engineer and a technologist to start planning out in more detail what work needs to be done with each plant, and then close to three months prior, we start in great detail to actually plan out the shutdown down to the detail level ... and try to understand how much resources we have and then what other resources do

we need to go out and get in order to handle the whole shutdown.

During a biannual shutdown, all chemicals are emptied out of the vessels to "get it ready for people to actually go inside the vessels" to conduct an inspection. The emergency shutdown system also is inspected. The plant is staffed twenty-four hours a day, seven days a week while the shutdown is taking place. Maintenance coordinators coordinate the hour-to-hour work that takes place. Supervision is handled by team managers although engineers also assist with the supervision. Eastman employees conduct much of the plant-wide maintenance and inspection work during the shutdown.

Kniedler described a heat exchanger as a vessel or cylinder that has heads on both sides and "some of them have thousands of small tubes [inside] that just run the whole length." The heat exchangers use steam to transfer heat to a medium or river water to cool the medium. While Eastman employees conduct visual inspections of the heat exchangers to look for any obvious problems, Eastman does not have the technology to conduct non-destructive electromagnetic testing. Eastman contracted with TesTex which does have that technology and is able to test the tubes inside the heat exchangers for any indication that the heat exchangers may be "getting ready to fail." The data collected by TesTex is used by Eastman to determine the condition of the exchangers and whether any corrective action needs to be taken. Kniedler acknowledged that based on the results of the tests performed by TesTex during the May 2001 shutdown, Eastman did not have to make any repairs to the heat exchangers.

Kniedler explained that according to Eastman's policies, employees of an outside contractor such as TesTex are re-

quired either to undergo detailed safety training or to be escorted at all times by one of Eastman's employees or a trained contractor. Kniedler believed Plaintiff and the other TesTex employees did not have the required training and therefore were required to have an escort. Kniedler added that "the escort is with them at all times. So if they deem that they need to come in at night, then arrangements would be made to have an escort with them."

In addition to TesTex there were several other contractors onsite during the shutdown. All in all, there were around eight hundred (800) particular jobs being accomplished during the shutdown at a total cost of approximately $6,500,000. Kniedler stated that the shutdown is an integral part of Eastman's business and is needed to ensure Eastman has reliable operations and is in compliance with applicable legal safety requirements.

Kniedler acknowledged that Eastman did not decide when TesTex's employees started working on any particular day or when they took breaks, etc. Eastman did, however, set the timetable for when the project had to be completed and expected it to be completed according to the contract. TesTex determined which of its employees would be sent to Eastman's facility to complete the requirements of the contract. Eastman could not terminate the employment of any of the TesTex employees, but Eastman could insist that a particular TesTex employee not return to its facility. One of Eastman's employees named Randal was a pressure vessel inspector who worked closely with TesTex. According to Kniedler, Randal would determine if the results of the electromagnetic testing were as expected or perhaps suggest that TesTex try a different technique or "do things differently." However, Randal would not tell TesTex employees how to operate the equipment which they brought with them in order to conduct the testing.

The second witness was Plaintiff who testified that he is a nondestructive testing engineer with TesTex. Plaintiff stated that TesTex has proprietary equipment that is manufactured by TesTex and this equipment was used to test the heat exchangers at Eastman's facility. TesTex only tested the heat exchangers. TesTex would not have been the one to have repaired or replaced the exchangers if any of them had been found to be defective.

Plaintiff testified that he arrived at Eastman's facility on the day of the accident and initially went to a trailer to obtain a permit, presumably to show that he was authorized to be on the premises. Next, Plaintiff visually inspected the heat exchanger and then left to retrieve the equipment he needed to conduct the testing. Plaintiff was in the process of returning to where the heat exchanger was located when he and other TesTex employees were directed to use a particular elevator. The elevator opened up, two people exited the elevator, and Plaintiff started to walk onto the elevator and "the next thing I know, I was on the ground." Plaintiff stated that to his knowledge, the escort that was accompanying him was an Eastman employee. Plaintiff added that it was his understanding that no one at Eastman had the right to control the work he was performing at Eastman's facility.

The only proof offered at trial was Kniedler's and Plaintiff's testimony. Naturally, Kniedler's testimony was much more detailed than Plaintiff's with regard to the shutdown process which occurs at Eastman every two years. To the extent both witnesses were able to give testimony about a particular factual issue, their testimony was for the most part consistent. In holding that Eastman was Plaintiff's statutory employer the Trial Court did conclude

that Eastman did not have any direct control over how TesTex employees actually did their job. The Trial Court then added:

> [U]nder 50–6–113 if [Plaintiff] were here today suing Eastman Chemical Company for workers' compensation I would rule in his favor because I think it's covered under 50–6–113. This was a regular project of Eastman Chemical Company carried out every two years, and they were the prime contractor, did much of the work themselves, but things that they did not have the expertise, they ... outsourced it to other companies, and if I find that he would be covered, then the inverse is true, he cannot sue them for [negligence] ... under the exclusive remedy statute, 50–6–108, and, therefore, [the negligence] case is dismissed.

On appeal, Plaintiff relies heavily on *Murray v. Goodyear Tire & Rubber Co.,* 46 S.W.3d 171 (Tenn.2001). In that case the defendant, Goodyear Tire & Rubber Company ("Goodyear"), contracted with the plaintiff's employer to paint overhead air ducts. Goodyear required the plaintiff's employer to obtain liability insurance and to perform the work during "nonproduction" times and in accordance with Goodyear's safety regulations. *Id.* at 173–74. Goodyear employees periodically supervised the painters to ensure compliance with safety regulations. Although Goodyear supplied drop-cloths and tarpaulins to cover the floor and tires, the plaintiff's employer otherwise provided all the materials and equipment needed to accomplish the painting of the duct work. The plaintiff's employer directed the painting methods and scheduled the painters' work hours within the parameters established by Goodyear. *Id.* at 174. The plaintiff was severely injured when an air duct he was painting collapsed causing him to fall eighteen feet. The Plaintiff then filed a workers' compensation lawsuit against his

employer and Goodyear, claiming Goodyear was his statutory employer. The trial court concluded that the amount of control exercised by Goodyear was sufficient for Goodyear to be deemed plaintiff's statutory employer. *Id.* at 173.

On appeal the Supreme Court reversed the decision reached by the trial court. In so doing, the Supreme Court explained that the Tennessee Legislature extended the employer/employee relationship by enacting Tenn.Code Ann. § 50–6–113 which provides that a principal contractor will be liable for workers' compensation benefits when, at the time of injury, the employee was engaged upon the subject matter of the general contract and the injury occurred in, on, or about the premises under the control or management of the principal contractor. *Id.* at 175. According to the Court:

> The determinative question in this case, then, is whether Goodyear is a principal contractor within the meaning of section 50–6–113 and therefore liable for workers' compensation benefits as a statutory employer.... A company or other business is considered a principal contractor if the work being performed by a subcontractor's employees is part of the regular business of the company or is the same type of work usually performed by the company's employees. *See Barber v. Ralston Purina,* 825 S.W.2d 96, 99 (Tenn.Ct.App.1991).... Undoubtedly, regular maintenance, repair, painting, and cleaning are an "expectable, routine and inherent part of carrying on any enterprise," *Smith v. Lincoln Mem'l Univ.,* 202 Tenn. 238, 304 S.W.2d 70, 74 (1957), and the record reflects that Goodyear employees occasionally perform small maintenance tasks. However, Goodyear subcontracts out those projects that are more extensive in nature, or that require "special

equipment [and] special techniques." This project could hardly be classified as a regular part of the employer's regular work, as the evidence presented at trial demonstrates that it could only be completed at certain times, such as when the plant was not in operation. Moreover, there is no indication that cleaning and painting overhead ducts some eighteen to twenty feet above the ground is the type of project that needs to be done on a continual basis.

*Id.* at 175–76.

The *Goodyear* Opinion went on to add that even if a company contracts out work that is not usually performed by its employees, the company still may be considered a principal contractor based on the right of control over the conduct of the work and the employees of the subcontractor. The control test is satisfied if the proof establishes the employer had a right to control, regardless of whether that right was exercised. *Id.* The Court concluded that the control test was not met because: (1) Goodyear did not hire the plaintiff or include him in the contract negotiations; (2) Goodyear paid the plaintiff's employer for the full contract amount and plaintiff's employer, in turn, paid the plaintiff an hourly wage; (3) Goodyear could not terminate the plaintiff's employment; and (4) Goodyear neither possessed nor exercised any control over how the plaintiff performed the work other than to ensure compliance with safety regulations applicable to everyone in the building. *Id.* at 176–77.

If we view Eastman's contract with Tes-Tex in total isolation, then Plaintiff's argument that Eastman was not his statutory employer is appealing. For example, since Eastman did not possess the technology to perform the non-destructive electromagnetic testing, it certainly could be argued that such testing could never be considered work "usually" performed by Eastman employees. In other words, Eastman employees cannot be considered to usually perform work they in fact have never done. *Goodyear* would be more factually on point if Eastman had simply decided that it was a good idea to conduct non-destructive electromagnetic testing on the heat exchangers and entered into a contract with TesTex to perform the testing at a time when Eastman was not in the throes of one of its shutdowns. Of course, that is not what happened.

However, if we do not view Eastman's contract with TesTex in isolation but instead look at the entire picture, then Plaintiff's argument loses much of its appeal. What we have is a large company which manufactures chemicals, plastics and fibers. Due to the nature of what is being manufactured along with how it is being manufactured, every two years the entire complex is shutdown and must be cleaned, inspected, repaired and/or updated. This comprehensive shutdown lasts around the clock for twenty days and when it is finally completed, the planning for the next shutdown begins. During the shutdown the plant is staffed twenty-four hours a day and Eastman employees conduct as much of the repair, inspection and maintenance work as possible and, if necessary, outside contractors are brought in to accomplish the remainder of the work. The shutdown is planned by engineers, technologists, etc., all the way down to the "detail level" with roughly eight hundred different jobs being mapped out at a total cost of $6,500,000. Unlike the painting of the duct work in *Goodyear*, the evidence in the present case demonstrates that the work performed during a shutdown must be done on a continual basis, i.e., every two years, in order for the plant to operate properly, effectively, and in compliance with applicable safety regulations. When no shutdown

is in effect, the next shutdown is being planned. This means that either a shutdown or the planning for a shutdown is ongoing by Eastman most all of the time.

The facts in the present case are more similar to those addressed by the United States District Court for the Eastern District of Tennessee in *Lambert v. Tennessee Valley Authority,* No. 1:01–CV–330, 2002 WL 32059747, 2002 U.S. Dist. LEXIS 26340 (E.D.Tenn. Sept.17, 2002). In *Lambert,* the plaintiff was injured while working on an ice-blowing auger machine at TVA's Sequoyah nuclear power plant. The plaintiff brought a negligence claim against TVA and the primary issue was whether that claim was barred by the exclusive remedy rule in the workers' compensation law. The district court concluded the plaintiff's negligence claim was barred and granted TVA's motion for summary judgment. In so doing the district court noted that TVA's electric power operations continuously involved maintenance and modification of its nuclear power plants. While TVA employees accomplished a "significant amount" of this work, TVA also entered into contracts with other companies to perform "much" of the work. *Lambert,* 2002 WL 32059747, at *2, 2002 U.S. Dist. LEXIS 26340, at *4. The *Lambert* Court observed that the Sequoyah nuclear power plant had two nuclear power units with each unit having an ice condenser system containing roughly two million pounds of ice. TVA's maintenance procedures required that each ice condenser be inspected, serviced, and replenished with ice every eighteen months. The entire maintenance process for each condenser typically lasted "twenty days with two twelve-hour shifts of approximately forty workers for each shift." *Id.,* 2002 WL 32059747, at *2, 2002 U.S. Dist. LEXIS 26340, at *5. The plaintiff worked for Stone & Webster Construction Company ("S & W") which had a long term contract with TVA to provide maintenance services at TVA's nuclear power plants. The district court ultimately concluded that TVA was a statutory employer pursuant to Tenn.Code Ann. § 50–6–113 in that TVA was acting as its own principal contractor at the Sequoyah nuclear power plant. In reaching this conclusion, the district court made several factual observations which are analogous to the facts in the present case. Specifically, the district court stated:

> [T]his Court finds that the maintenance service performed on the ice condensers at Sequoyah by S & W was part of the regular business of TVA and was the same type of work (maintenance service) usually performed by TVA's employees. As part of its operation of nuclear power plants, TVA routinely and continuously engages in modification and maintenance services on its facilities. ·Regular maintenance and repair work are an inherent part of carrying on the enterprise of operating nuclear power plants. Although TVA may not have had its own direct employees performing a substantial part of the actual manual ˙labor on the ice condenser and remove the thick ice from the auger …, this fact is not dispositive of the outcome here. The totality of the circumstances establishes that TVA was the principal contractor on its own premises at Sequoyah.

TVA may be a principal contractor in the regular business of performing a particular task (maintenance service on ice condenser at Sequoyah) without necessarily having TVA employees do the manual labor. *Brown,* 844 S.W.2d at 138. TVA is engaged in a business—the operation of nuclear power plants—which by its size and nature requires TVA to have an extensive ongoing program of constant construction, modification, replacement, and maintenance ser-

vice. Prior to 1991, TVA carried out its maintenance duties through its own employees. After 1991, TVA turned to outside companies such as S & W for assistance in performing the maintenance service work that forms a part of TVA's regular business activity in operating the nuclear power plants. TVA's employees have continued to work on maintenance activities after 1991, and the TVA—S & W contract authorizes TVA to use and rely on its own employees to perform work duties within the scope of the contract. Therefore, TVA is the principal contractor at Sequoyah. *Id. Lambert,* 2002 WL 32059747, at *4-5, 2002 U.S. Dist. LEXIS 26340, at *11–13.

Although the decision in *Lambert* is not binding on this Court, we agree with the reasoning of the Court in that case and reach a similar conclusion here. Without question, the events which take place during the shutdown are of vital importance to Eastman and are undertaken to ensure that the plant is running properly and efficiently during the remaining 102 weeks out of every two year period. In addition, the shutdown is needed to make sure the plant is running safely and in accordance with safety regulations. Either a shutdown or the planning of the next shutdown is continual at Eastman. It necessarily follows that the work activities taking place during the shutdown are part of Eastman's regular business because they are what Eastman does on a regular basis as a necessary part of its ongoing business operation and, without them, there likely would be no business.

The shutdown should be viewed as one large project which has been carefully choreographed over the preceding two years

so that roughly eight hundred particular jobs can be completed in just twenty days. Eastman is undoubtedly the principal contractor on this project and much of the repairing, cleaning, inspecting, testing, supervising, upgrading, etc., is accomplished by Eastman employees. The evidence presented to the Trial Court shows that the work performed during the shutdown is an integral part of Eastman's regular business. The evidence does not preponderate against the Trial Court's findings, and we conclude that the testing and/or inspecting accomplished by TesTex was part of the regular business of Eastman and the same type of work (i.e., testing, inspecting, etc.) performed by Eastman employees. This result is not changed simply because Eastman did not have the technology to perform non-destructive electromagnetic testing and was required to contract with another company in order to accomplish this one of over eight hundred particular jobs being completed during the twenty day shutdown.

■ In summary, we conclude that TesTex was performing work which was part of the regular business of Eastman *and* which was typically performed by Eastman's employees.[4] Accordingly, the Trial Court correctly determined that Eastman was a principal contractor for purposes of Tenn.Code Ann. § 50–6–113 and is Plaintiff's statutory employer. It necessarily follows that the exclusive remedy rule contained in Tenn.Code Ann. § 50–6–108 bars Plaintiff's negligence claim. In light of this holding, the issue of whether Eastman was a principal contractor because it had the right to control the conduct of TesTex's work and its employees is pretermitted.

---

**4.** We note that *Goodyear* only requires Eastman to establish either that "the work being performed by a subcontractor's employees is part of the regular business of the company *or*

is the same type of work usually performed by the company's employees." *Goodyear,* 46 S.W.3d at 176 (emphasis added).

## Conclusion

The Judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for further proceedings as necessary consistent with this Opinion and for collection of the costs below. Costs on appeal are assessed against the Appellant Charles W. Randolph, II, and his surety.